IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WORLD WIDE TECHNOLOGY, INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MARK BENNETTS, )<br>)<br>Defendant. )<br>)<br>Serve: )<br>)<br>1310 289th Ave. NE )<br>Carnation, WA 98014 ) | Case No. |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff World Wide Technology, Inc. ("WWT"), for its causes of action against defendant Mark Bennetts ("Bennetts"), states as follows:

### Introduction

1. This is an action brought by WWT against Bennetts, a former Account Executive with WWT, to enforce the terms of a Nondisclosure and Nonsolicitation Agreement between WWT and Bennetts, dated January 1, 2009 (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit A, and its terms are incorporated by reference herein.

2. Pursuant to the Agreement, Bennetts agreed, among other things, not to solicit or divert business from certain customers of WWT and not to disclose or use any of WWT's confidential information. Since he voluntary resigned from WWT in August of 2009, Bennetts has solicited business from WWT's customers and diverted business from WWT in direct competition against WWT, and, upon information and belief, misused and disclosed

WWT's confidential information. Bennetts' activities are in flagrant breach of the terms of the Agreement.

### Jurisdiction and Venue

3. This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

4. Venue is proper in the Eastern District of Missouri, Eastern Division, pursuant to 28 U.S.C. § 1391(a)(2). In addition, the parties agreed in Section 7 of the Agreement that disputes relating to the Agreement may be brought in this Court..

### Parties

5. Plaintiff WWT is a corporation organized under the laws of the State of Missouri with its principal place of business in St. Louis County, Missouri. WWT is a citizen of the State of Missouri. WWT designs, engineers, installs, maintains and sells, among other things, computer hardware and software, fully integrated computer systems and solutions, and internet solutions, IT consulting, staff augmentation services, and provides supply-chain management services and solutions to manufacturers, distributors and purchasers throughout the country. WWT is a direct-value added reseller of network solutions products and services (i.e. "Partner") for various telecommunications companies, including Cisco Systems, Inc. ("Cisco"). WWT is a "Gold Certified" Cisco Partner and a top seller of Cisco products and services.

6. Bennetts is an individual who is a citizen of the State of Washington. Bennetts was formerly an Account Executive with WWT. As an Account Executive, Bennetts sold hardware and software solutions, products and services (including Cisco hardware and software solutions, products and services) to some of WWT's key customers, including (but not

limited to) Group Health Cooperative ("Group Health"), McKinstry, Inc. ("McKinstry"), Real Networks, Inc. ("Real Networks"), The Central Puget Sound Regional Transit Authority ("Sound Transit"), Demand Media ("Demand Media") and Classmates Online, Inc. ("Classmates").

7. Bennetts is currently employed by Juniper Networks ("Juniper"), a global network provider and direct competitor of Cisco. Juniper is also a direct seller of network solutions products and services and a direct competitor of WWT.

## Factual Background

8. Bennetts began his employment with WWT on August 29, 2008 as an Account Executive, a position he held until he voluntarily resigned his employment with in August 2009. In his capacity as an Account Executive, Bennetts developed, fostered and maintained relationships with WWT's customers, including (but not limited to) Group Health, McKinstry, Real Networks, Sound Transit, Demand Media and Classmates.com. He also acquired knowledge of WWT's confidential, proprietary and competitively valuable information.

9. On or about January 1, 2009, Bennetts signed the Agreement. In the Agreement, Bennetts acknowledged that "(i) WWT has spent substantial money, time and effort over the years in developing and solidifying its customer relationships and goodwill and in developing its confidential and trade secret information; (ii) long-term customer relationships and goodwill often can be difficult to develop and require a significant investment of time, effort and expenses; (iii) WWT pays its employees . . . to, among other things, develop, preserve and use confidential and trade secret information, customer goodwill, customer loyalty and customer contacts for and on behalf of WWT. . . ." Bennetts further acknowledged that WWT was employing him based upon his assurances and promises "not to divert WWT's customers'

goodwill or to put himself . . . in a position following [his] employment with [WWT] in which the confidentiality of the WWT's confidential or trade secret information or the goodwill of any of the customers of WWT might somehow be compromised." (See Agreement, § 4).

10. Bennetts also recognized that, in light of WWT's interests in it customer relationships and confidential information, if he were to leave WWT, WWT would need certain protection in order to ensure (among other things) that Bennetts did not divert any goodwill developed, solidified or enhanced in connection with his employment, misappropriate or misuse any confidential information entrusted to him during the course of his employment with WWT, or take any other action that would provide others with an unfair competitive advantage over WWT. (See Agreement, ¶ F).

11. To that end, Bennetts agreed to limited post-termination restrictions on his ability to use WWT's confidential information for competitive purposes or exploit the customer relationships he preserved, fostered, maintained and developed on WWT's behalf during his WWT employment. These restrictions are contained in Sections 2 and 4 of the Agreement.

12. Section 2(a) of the Agreement prohibits, inter alia, the disclosure and misuse of confidential information of WWT. Section 2(a) of the Agreement provides as follows:

> "2. (a) Employee shall keep confidential, and not use or disclose to any third-parties, except as required for Employee to perform Employee's employment responsibilities, any of the confidential business or trade secret information of the WWT Group, which includes that relating to (among other things) the WWT Group's strategic and business plans; product pricing information and analyses; patents, discoveries and the like, investments and plans; product positioning and related strategies; customer identities and customer-related information; new product plans; target markets; and expansion plans and strategies."

12. In Section 2(b) of the Agreement, Bennetts agreed that all files, records, documents, memorandums, notes or other documents containing WWT's confidential

4

information were WWT's exclusive property and were to be returned upon Bennetts' termination of employment. Section 2(b) of the Agreement provides as follows:

> "(b)  All software, notes, records, drawings sketches, manuals, notebooks, computer diskettes and other documents or media obtained by or provided to Employee, or otherwise made, produced or compiled during Employee's employment with WWT, which contain any confidential information of any member of the WWT Group, regardless of the medium in which it is preserved, are the sole and exclusive property of such member of the WWT Group and shall be given to WWT at WWT's request or upon Employee's departure from WWT."

13.  Section 4 of the Agreement contains limited customer-based restrictive covenants which provide, in relevant part, as follows:

> "4.  Employee agrees that during Employee's employment with WWT and for a period of one year thereafter, Employee shall not, directly or indirectly, on Employee's behalf or on behalf of any other person, firm, corporation, partnership or other entity:
>
> (a)  solicit or make any statement or do any act intended to cause any person or entity that was a customer or client of WWT at any time during the one year immediately preceding Employee's termination of employment to make use of or obtain from any person or entity other than WWT, services or good which are of the same general type, perform similar functions or are used for the same purposes as the services or goods which have been offered by WWT during the last one year of Employee's employment with WWT.
>
> (b)  solicit or make any statement or do any act intended to cause any prospective customer or client of WWT to make use of or obtain from any person or entity other than WWT, services or goods which are of the same general type, perform similar functions or are used for the same purposes as the services which have been offered by WWT during the last one year of Employee's employment with WWT;
>
> (c)  cause or attempt to cause any person or entity that was a customer or client of WWT at any time during the one year immediately preceding Employee's termination of employment with WWT, to divert, terminate, limit or in any manner modify or fail to enter into, my actual or potential business relationship or opportunity with WWT;
>
> (d)  cause or attempt to cause any prospective customer or client of WWT, to divert, terminate, limit or in any manner modify or fail to enter into, any actual or potential business relationship or opportunity with WWT...."

Section 4(e) of the Agreement defines "prospective customer or client" as "any person or entity with whom any employee of WWT has had written (including faxed or electronic) contact concerning any proposed order from, or other business relationship with, WWT within the three months prior to [Bennetts'] termination of employment.

14. In Section 5 of his Agreement, Bennetts acknowledged that the post-employment restrictions imposed by the Agreement were necessary for the protection of WWT's customer relationships and its confidential information. Section 5 provides as follows:

> "5. Employee recognizes and agrees that the restraints contained in Section 4, both separately and in total, are reasonable and enforceable in view of WWT's legitimate interests in protecting the confidential and trade secret information and customer goodwill of WWT and the other members of the WWT Group. Employee further acknowledges and agrees that the restrictions in Subpart 4(c) are reasonable because (i) Employee is in a position to identify other WWT employees integral and/or critical to the success of the WWT Business; (ii) such restrictions protect against the possible loss or misuse of confidential or trade secret information of the WWT Group by other WWT employees; [and] (iii) such restrictions protect the customer relationships and/or goodwill associated with other WWT employees. . . ."

15. In Section 9 of the Agreement, Bennetts agreed that "[i]n the event of a breach or threatened breach of [the] Agreement, WWT shall be entitled, in addition to any other legal or equitable remedies it may have, to temporary, preliminary and permanent injunctive relief restraining such breach or threatened breach." Bennetts also agreed, in Section 7 of the Agreement, that "[a]ny litigation arising out of, in connection with or otherwise involving any noncompliance with or alleged breach of this Agreement shall be filed and conducted exclusively in Missouri. " Bennetts also agreed that the Agreement "shall be interpreted in accordance with and governed by the laws of the State of Missouri" and that "[i]f there is any breach of the Agreement, the breaching party shall be liable for the attorney's fees and costs incurred by the non-breaching party in enforcing the Agreement."

16. With the use of valuable resources and support provided by WWT, Bennetts established and/or cultivated commercially advantageous relationships and goodwill with WWT's customers. As a result, Bennetts enjoys substantial customer goodwill with WWT's customers and has obtained WWT's confidential and competitively valuable information, both of which would help him, as well as Juniper, if he were allowed to solicit WWT's customers on behalf of Juniper. The customer relationships and goodwill that Bennetts developed and enhanced during his employment with WWT are extremely valuable assets in the information technology industry.

17. Furthermore, in his position as an Account Executive with WWT, Bennetts had access to WWT's confidential information – information which would give Bennetts an unfair competitive edge if he were permitted to use it in violation of the Agreement. Bennetts knows, for example, the preferences of WWT's customers and the pricing offered to these customers; WWT's strategic and business plans, WWT's plans for new products and services, and WWT's target markets and expansion plans and strategies.

18. Bennetts' improper use and disclosure of WWT's confidential information, and/or his taking advantage of the customer relationships and goodwill he enjoys as the result of his employment by WWT, has been, and will continue to be, highly damaging to WWT. Bennetts' particularized knowledge of WWT's confidential information, including information relating to WWT's pricing and business strategies, combined with the goodwill that Bennetts enjoys with WWT's customers, would give Bennetts an unfair competitive advantage if he were allowed to continue to exploit WWT's confidential information and customers relationships in violation of his contractual obligations.

## Current Dispute

19. In August 2009, Bennetts voluntarily resigned his employment with WWT. In his notice of resignation, Bennetts stated that his "first priority" was to protect the WWT customers that were brought on during his employment "with warm handover calls with the customer," and his "second priority" was to "protect and serve [WWT]," and make sure that there was a "seamless transition." (See Email from M. Bennetts to H. Lind, August 10, 2009, attached hereto as Exhibit B and incorporated herein by reference).

20. Despite these representations, WWT has recently received multiple reports that Bennetts has been soliciting WWT's customers on behalf of Juniper. Specifically, WWT has learned that Bennetts been in contact with several of WWT's customers since he joined Juniper, including Group Health, McKinstry, Real Networks, Sound Transit, Demand Media and Classmates.com.

21. On or about October 5, 2009, counsel for WWT sent a letter to Bennetts by certified mail reminding him of his obligations under the Agreement and demanding that Bennetts abide by the terms of the Agreement (the "October 5 Letter," attached hereto as Exhibit C and incorporate herein by reference). WWT also sent a copy of the October 5 Letter to Juniper. In this letter, WWT asked that Bennetts and Juniper provide written assurance by October 12, 2009 that Bennetts would immediately discontinue all contact with WWT's customers and prospective customers and that Juniper would adopt procedures to ensure that Bennetts will comply with the Agreement during his employment. As of the date of this filing, neither Juniper nor Bennetts had provided the requested assurances.

22. Bennetts has blatantly breached the express terms of the Agreement by soliciting WWT's customers on behalf of Juniper. Injunctive relief is needed to prevent Bennetts

from continuing to disregard his contractual obligations, and to put an end to the harm and losses occasioned by his misconduct.

## Count I – Breach of Contract

23. WWT realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 22 of this Verified Complaint.

24. WWT has complied in all material respects with its obligations under the Agreement.

25. The terms of Bennetts' Agreement are reasonable and necessary to protect the legitimate business interests of WWT.

26. Bennetts has breached (and continues to breach) the terms of the Agreement by, at the very least, soliciting and pursing customers of WWT for or on behalf of Juniper. In addition, and upon information and belief, Bennetts misused and/or disclosed confidential and proprietary information of WWT in soliciting customers of WWT for business for or on behalf of Juniper.

27. By virtue of Bennetts' breaches of the Agreement, WWT has suffered and will continue to suffer actual and substantial pecuniary loss. Monetary damages cannot fully or adequately compensate WWT for the harm and losses caused by Bennetts' misconduct in diverting customer relationships and/or disclosing or using WWT's confidential information for the benefit of Juniper.

28. Unless enjoined, Bennetts' conduct will cause significant and irreparable injury to WWT. WWT has no adequate remedy at law to protect itself from the continuing harm, damage and injury which have been and will be caused by the improper acts of Bennetts.

WWT has been and will continue to be subject to irreparable harm and injury if Bennetts is permitted to continue violating his obligations under the Agreement.

29. Pursuant to Section 7 of the Agreement, WWT is entitled to attorney's fees and costs incurred in connection with this action.

WHEREFORE, WWT prays for this Court to enter judgment in its favor and against Bennetts, and for the Court to:

(a) enjoin Bennetts temporarily, preliminarily during the pendency of this action and permanently thereafter from violating his obligations under the Agreement;

(b) order that Bennetts return all documents or other materials containing WWT's confidential information to WWT;

(c) award WWT compensatory damages in an amount to be determined based upon the evidence adduced at trial;

(d) award WWT the attorney's fees and costs it incurred in connection with this action; and

(e) order such further and additional relief as this Court deems just and proper.

BRYAN CAVE LLP

By: /s/ 
Robert T. Ebert, Jr. # 3035
Kimberly A. Mohr, #54067
One Metropolitan Square
211 North Broadway
Suite 3600
St. Louis, MO 63102
Tel: (314) 259-2000
Fax: (314) 259-2020

Attorneys for Plaintiff
World Wide Technology, Inc.

<u>Verification Page</u>

STATE OF MISSOURI     )
                      ) ss:
COUNTY OF ST. LOUIS   )

I, Dan Walters am the Director, Commercial West Region, of World Wide Technology, Inc. ("WWT"). I have read the Verified Complaint for Injunctive and Other Relief and the facts contained therein are known to me to be true and correct, to the best of my information and belief.

_____

Subscribed and sworn to before me, a Notary Public, on this 30th day of October, 2009.

_____
Notary Public

My commission expires:

2/25/2013

KIMBERLY A. VALLERO
My Commission Expires
February 25, 2013
St. Louis County
Commission #09457616

11